

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

DCP:ADW
F. # 2020R00345

*271 Cadman Plaza East
Brooklyn, New York 11201*

April 20, 2022

By ECF

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Kevin Jay Lipsitz
               Criminal Docket No. 20-394 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in advance of sentencing in the above-referenced case, scheduled for May 5, 2022, and in response to the defendant's sentencing memorandum. See ECF No. 36 ("Def. Mem."). For the reasons stated below, the government respectfully requests that the Court impose a sentence of incarceration below the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), two years of supervised release, a $90,000 forfeiture judgment, and restitution.

I.     Facts

     A.   The COVID-19 Pandemic and Scarcity of PPE

      The instant offense occurred in the early days of the COVID-19 pandemic, at a time when spread of the disease across the country—and especially in New York—threatened to overwhelm healthcare systems. See Presentence Investigation Report, dated February 25, 2022 ("PSR") ¶¶ 6-8. As early as January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a national public health emergency due to the spread of COVID-19. Id. ¶ 6. On March 13, 2020, the President of the United States declared a national emergency due to the rapid spread of COVID-19. Id. Around the same time, the Centers for Disease Control and Prevention began recommending that health care providers, emergency first responders, and other individuals that might come into close contact with those infected by COVID-19 use personal protective equipment ("PPE"). Id. ¶ 7.

The spread of COVID-19 led to immense strain on health care systems throughout the United States, as well as a rapid depletion of available stores of PPE and other medical resources. Id. ¶ 8. Accordingly, on March 18, 2020, the President issued Executive Order 13909, invoking the Defense Production Act of 1950 to address possible stockpiling and price gouging of crucially needed PPE. Id. ¶¶ 8-10. On March 23, 2020, the President delegated to the Secretary of HHS authority to prevent the excess accumulation of certain health and medical resources. Id. ¶ 11. Pursuant to that authority, the Secretary of HHS designated certain resources as scarce materials or materials the supply of which would be threatened by accumulation in excess of reasonable demands of business, personal, or home consumption, or for the purpose of resale at prices in excess of prevailing market prices. Id. Among other things, the list of designated materials included N-95 respirators, "other filtering facepiece respirators," PPE face masks, and PPE surgical masks. Id. The CDC recommended that health care workers use N-95 respirators in hospitals and other medical treatment environments, especially when conducting procedures that may produce aerosols. Id. ¶ 12.

      B. <u>SuperGoodDeals.com and the Defendant's Sale of PPE</u>

The defendant is the CEO and sole owner of SuperGoodDeals.com Inc. ("SGD") and has been since 2007. Id. ¶ 14. The defendant and SGD sell merchandise directly to consumers through a website that bears the URL www.supergooddeals.com (the "Website") and offers a large variety of items such as clothing, electronics, bathroom products and home goods, most of which are unbranded and/or generic versions of common household items. Id.

Before the outbreak of the COVID-19 pandemic, the defendant and SGD did not market or sell PPE in the normal course of business. Id. ¶ 15. However, starting on approximately February 1, 2020 and through the end of May 2020, the defendant and SGD accumulated large quantities of PPE and other health and medical resources, some of which had been designated as scarce and threatened materials by the Secretary of HHS. Id. For example, in February 2020, the defendant purchased more than 16,000 disposable surgical facemasks from the e-commerce website known as eBay. Id. Between February 2020 and April 2020, the defendant also bought or tried to buy more than 600,000 disposable surgical facemasks from third parties. Id. And between March 2020 and May 2020, the defendant bought more than 7,000 N-95 respirators and more than 6,000 KN-95 respirators.[1] Id.

The defendant advertised on the Website several different models of N-95 respirators, KN-95 respirators, disposable surgical facemasks, and PPE face shields. Id. ¶ 19. The defendant listed such items at prices well above recommended manufacturer prices and the prices at which the defendant acquired the items. For example, the defendant advertised and sold hundreds of 3M Model 8210 and Model 8210 Plus N-95 respirators for $19.95 to $21.95 per unit, even though he had previously acquired many such units for about $6.30 to $7.82 per unit, and the manufacturer's recommended list price for such items was between $1.02 and $1.50 per unit. Id. ¶¶ 17-22.

---

[1] For example, on March 31, 2020, the defendant bought 2,000 3M N-95 respirators on eBay, paying about $6.30 per unit. See PSR ¶ 17.

Likewise, the defendant sold KN-95 respirators and disposable surgical facemasks at prices well above the price of acquisition. For instance, the defendant acquired KN-95 respirators at an average cost of $2.00 per unit but typically resold them at a per-unit cost of $12.95. Id. ¶ 22. In addition, the defendant bought disposable surgical facemasks at about $0.27 to $0.38 per unit but resold them at a per-unit price of $0.76. Id.

In addition to selling PPE directly through the Website, the defendant also sold PPE to consumers through websites that aggregate and provide links to "deals" for products sold on other websites, as well as through listings on eBay. Id. ¶ 23.

C. The Instant Offense of Conviction

A prominent selling point of the Website was "free and fast shipping." Id. ¶ 25. Throughout the period of the defendant's conduct, the Website displayed banners on the landing page, specific product pages, and elsewhere, which included text such as "FREE SHIPPING for all shipments ANYWHERE in the USA," and "Pay Today, Ships Tomorrow." Id. On a page listing shipping and deliveries policies, the Website expressly stated the following: "We pride ourselves on fast order processing. Pay Today, Ships Tomorrow! [. . .] All orders come with free tracking numbers and insurance, which is emailed to you at time of shipment. [. . .] Whether you choose our FREE standard shipping or one of the optional upgrades, your order will ship tomorrow, if paid today (unless tomorrow is a Sunday or a postal holiday, then it will ship the following business day." Id.

When the defendant started to advertise and sell PPE on the Website, he included similar statements about the speed of shipment on product pages for PPE and banners. For example, the listings for N-95, KN-95 respirators, and disposable surgical facemasks all included claims that the products were in stock and used the phrase "pay today, ships tomorrow." Id. ¶ 26. Examples of such product page and banners can be seen as follows:



3

 

The defendant knew that the foregoing statements regarding the speed of order processing and shipment were materially false misrepresentations, and he made them as part of a fraudulent scheme to convince customers to pay him money for speedily shipped PPE. Id. ¶ 27. Based in part on these false representations, which were listed on the Website, aggregator websites, and eBay, the defendant obtained more than $180,000 from victims, for whom "fast turnaround" was significant to their decisions to purchase the PPE from the defendant. Id. In fact, contrary to his misrepresentations, the defendant frequently processed and mailed orders of PPE many days or weeks after payment. Id. ¶¶ 28-29. For example, though the defendant received more than 200 orders for PPE between March 27, 2020 and April 10, 2020, the U.S. Postal Service did not receive the defendant's shipments for approximately 170 of those orders until three weeks or longer after the original order date. Id. ¶ 29. Indeed, in some instances, the defendant did not mail PPE ordered from the Website until more than five weeks after the order date. Id.

The defendant's conduct caused more than 50 customers to file complaints with the Better Business Bureau.[2] All of those complaints focused on delays in receiving PPE from SGD, with many customers describing weeks-long delays. Dozens of the complaints also described unsuccessful efforts to contact the defendant regarding refunds and status updates, phone calls with the USPS, payment disputes with banks and payment processors, and purchases of PPE from alternative sources due to delays in receiving PPE from SGD.

While most of the customers harmed by the defendant's fraud only placed small orders of PPE, some customers ordered large amounts on behalf of entire companies. For instance, an employee of a Tennessee-based medical billing, equipment, and supply services company ordered 30,000 disposable surgical facemasks from the defendant ("Victim 1"). Id. ¶ 30. The defendant specifically assured Victim 1 that SGD could process the order and deliver it within three days. Id. Consequently, Victim 1 ordered 30,000 surgical facemasks on March 20, 2020 and received an order confirmation email soon thereafter. Id. However, when the order did not arrive as promised, the defendant refused to cancel the order, gave excuses regarding shipping and manufacturing issues, and later told Victim 1 that the masks were being flown in from China. Id. Ultimately, Victim 1's company did not receive the masks until about three weeks after placing the order. Id.

Similarly, a radiologist in New Jersey looked to buy a large number of disposable surgical facemasks from the defendant early on in the COVID-19 pandemic ("Victim 2"). Id. ¶ 31. On March 30, 2020, Victim 2 ordered 10,000 surgical facemasks from the Website on behalf of his medical practice, based in part on the defendant's false promise that the masks would ship

---

[2] Copies of the complaints were produced to the defendant under Bates numbers LIPSITZ001576-002162. The government can provide copies of the complaints to the Court upon request.

quickly. Id. Despite receiving a tracking number shortly after placing the order, Victim 2 did not receive the masks until nearly three weeks later. Id. Likewise, an individual in Michigan ordered 1,000 surgical facemasks for his colleagues based on the Website's statements that the items were in stock and available for next-day shipping ("Victim 3"). Id. ¶ 32. Similar to the other victims, Victim 3 did not receive the masks until several weeks after placing the order. Id.

In total, the defendant's conduct resulted in losses to victims of more than $95,000. Id. ¶ 37. This figure represents profits earned by the defendant through his fraudulent marketing of PPE during the relevant period, net of costs and refunds that the defendant issued to customers who complained of shipping delays.

On September 23, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One through Three), two counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts Four and Five), and one count of willful accumulation of designated scarce materials for the purpose of resale at prices in excess of prevailing market prices, in violation of 50 U.S.C. §§ 4512 and 4513 (Count Six). See ECF No. 8.

On October 7, 2021, pursuant to a plea agreement, the defendant pleaded guilty to Count Four of the Indictment before this Court. PSR ¶ 1; see Oct. 7, 2021 Plea Hearing Tr. ("Plea Tr.") at 20:11 – 23:1.

D. The Defendant's Criminal History

The defendant has one previous felony conviction. On September 23, 1999, the defendant was convicted in state court of fourth-degree grand larceny (a Class E felony). See PSR ¶ 54. For this offense, the defendant was sentenced to five years of probation. Id. The defendant committed the underlying offense when he created nine fraudulent checks and deposited them with Staten Island Savings Bank, allowing the defendant to steal $82,000 from the bank. Id. In post-arrest statements, the defendant admitted his guilt and claimed that he had forged the checks because he needed a "loan" to help his business survive, as customer complaints and business debts had become unmanageable. Id. The defendant claimed that he deposited the checks with the intention of paying the bank back and did not mean to defraud the bank. Id.

In connection with the conviction, the defendant filed for bankruptcy and was ordered to pay $2,780 per month for a period of 60 months. Id. Court records indicate that he made four payments in 1999, totaling $14,290. Id. The PSR does not indicate if the defendant made any other payments in connection with his bankruptcy obligations. In his objections to the PSR, the defendant claims that he paid the full amount owed in the bankruptcy proceedings. See Def.'s PSR Objections, dated March 7, 2022 ("Def. Objections") ¶ 54. Due to the age of the case, the government has not been able to locate any records for the bankruptcy proceeding.

More recently, on November 10, 2021, the defendant was arrested and later charged with second-degree assault, acting in a manner injurious to a child less than 17, and assault with criminal negligence. PSR ¶¶ 58-59. These charges, though later dismissed, arose from incidents in which the defendant allegedly assaulted his young daughter on two separate occasions, with one assault being so severe that it fractured the daughter's wrist. Id.

5

III.     Guidelines Calculation

The government agrees with the Probation Department's calculation of the Guidelines as set forth in the PSR. The PSR calculates the Guidelines total offense level to be 14, based upon an adjusted offense level of 17 and a three-level reduction for acceptance of responsibility. PSR ¶¶ 42-52. With an offense level of 14 and a Criminal History Category of I, the Guidelines recommend a sentence of 15 to 21 months in custody.

IV.     Argument

The government respectfully submits that the defendant should be sentenced to a sentence of incarceration below the recommended Guidelines range and two years of supervised release, which would be sufficient but no more than necessary to satisfy the purposes of 18 U.S.C. § 3553(a)(2).[3]

   A.   The Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

>  (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>  (2) the need for the sentence imposed—
>
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct; [and]
>
>   (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional

---

[3] Pursuant to the plea agreement, the defendant has also agreed to a pay a $90,000 forfeiture judgment. Restitution is also mandatory, in an amount to be determined by the Court.

treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B. Nature and Circumstances of the Offense

The government respectfully submits that a below-Guidelines sentence of incarceration, two years of supervised release, a forfeiture amount of $90,000, and restitution to be determined by the Court would adequately "reflect the seriousness of the offense" and "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Such a sentence will also provide appropriate punishment for the "nature and circumstances of the offense." See id. §§ 3553(a)(1).

The defendant's crime was serious and deserves a sentence of incarceration. During the early days of the COVID-19 pandemic, when fear of the novel coronavirus gripped the country and thousands of people sought out whatever protective measures they could, the defendant cynically took advantage of the crisis by selling PPE through false promises of speedy delivery. Between February 2020 and May 2020, the defendant acquired or attempted to acquire huge stores of PPE. Indeed, the defendant began looking for large quantities of disposable surgical facemasks as early as February 12, 2020, about a month before the President declared a national emergency and the public became widely aware of the dangers of COVID-19. In addition, the defendant's transaction records show that he spent well more than $100,000 to buy PPE during this period. In other words, the defendant saw public demand for PPE as an opportunity to be exploited early on and devoted a huge amount of time and resources towards that end.

To make sure that his gamble on selling PPE paid off, the defendant lied to his customers about how quickly they would receive protective gear. During those frightening and uncertain first few months, customers across the country tried to get their hands on PPE as soon as possible. Face masks in particular became an enduring symbol of the pandemic within a matter of days. It is little surprise, therefore, that the defendant's promises of "pay today, ships tomorrow" induced numerous SGD customers to buy N-95 respirators, KN-95 respirators, and disposable surgical facemasks from the Website. And yet, as the defendant admitted at his guilty plea hearing, he made such promises despite knowing at the time that, in most instances, he could not mail out PPE until some days after the fact. As multiple victims recounted to law enforcement during the investigation, and as reflected in dozens of complaints sent directly to the defendant and the Better Business Bureau, the lengthy delays between when customers ordered PPE from the defendant

7

and when the defendant actually mailed the PPE frustrated the customers and caused many of them to demand refunds and seek PPE elsewhere.

In this regard, it is troubling that the defendant tries to minimize his behavior and suggest it was aberrant rather than extensive. For example, the defendant says that delays were "often the result of backlogs being experienced by the USPS due to the COVID pandemic" and that SGD packages dropped off at post offices were sometimes held for examination, "adding to the shipping delay." Def. Mem. at 4-5. The defendant also asserts that shipping delays of several weeks were an "infrequent occurrence." Id. at 5. However, shipping records flatly contradict these claims. For instance, those records showed that in late March 2020 and early April 2020, the defendant did not even bring PPE shipments to the USPS until several weeks after they were ordered for the vast majority of orders. See PSR ¶ 29 (of more than 200 PPE orders received by the Website between March 27, 2020 and April 10, 2020, the USPS did not receive the defendant's shipments for approximately 170 of those orders until three weeks or longer after the original order date).

In a similar vein, the defendant challenges the PSR's conclusion that the defendant's misrepresentations regarding inventory and shipping speed were material to customers' decisions to order PPE from the Website. See Def.'s Objections ¶ 36. The defendant even seems to dispute his own fraudulent intent with respect to the promises he made to Victim 1. See Def.'s Objections ¶ 30 (describing delay in shipping PPE to Victim 1 as "unforeseen"). These are yet more attempts to evade accountability. The defendant knows that SGD's inventory and ability to timely ship PPE were material to customers' purchasing decisions, as the defendant received an enormous number of customer complaints regarding shipping delays, including requests to cancel or refund orders. Moreover, the defendant admitted to the Court that he knowingly lied to Victim 1 regarding the time it would take for her to receive her very large order of PPE. See Plea Tr. at 20:15-21:18 (defendant admitted that he promised Victim 1 order fulfillment within three days, despite knowing at the time that the PPE "would not be delivered within the time promised"). The Court should reject the defendant's attempts to minimize his conduct.

The defendant also challenges the application of the Guidelines enhancement due to the offense involving 10 or more victims. See Def.'s Objections ¶ 44. The defendant argues the enhancement should not apply because "that number includes purported victims for whom either credits were issued or purchase and/or shipping costs were refunded." Id. However, the defendant does not claim—because he cannot—that he reimbursed every victim of his fraud. Indeed, the estimated loss amount of more than $95,000, see PSR ¶ 37, already accounts for such reimbursements and therefore still reflects monetary losses to well more than 10 victims. Also, even reimbursements to victims would merely reduce the loss amount and would not render such customers "non-victims" who suffered no loss at all. See U.S.S.G. § 2B1.1, cmt. n. 1 (defining victim as "any person who sustained any part of the loss determined under subsection (b)(1)); U.S.S.G. § 2B1.1, cmt. n. 3(E) (loss amount shall be reduced by amount of "money returned . . .

by the defendant . . . to the victim before the offense was detected). Therefore, the Court should overrule the defendant's objection to this aspect of the PSR's Guidelines calculation.[4]

Ultimately, the defendant's conduct was wide-ranging, cynical, and harmful to a large number of desperate customers in the midst of a pandemic. The defendant tried to profit off of people's desire to protect themselves from COVID-19 by making promises that he knew he could not keep. And to this day, the defendant refuses to fully acknowledge the scope of his conduct. Those facts weigh heavily in favor of a sentence of incarceration.

C. <u>History and Characteristics of the Defendant</u>

The history and characteristics of the defendant also call for a below-Guidelines sentence of incarceration, two years of supervised release, a substantial forfeiture judgment, and restitution. See 18 U.S.C. § 3553(a)(1).

As described earlier, the nature and circumstances of the defendant's offense were serious and would justify a sentence of incarceration within the applicable Guidelines range of 15 to 21 months. However, as described in the PSR, the defendant suffers from a number of medical conditions and is under the care of multiple doctors. See PSR ¶¶ 72-74. .

As to family circumstances, the defendant is also the sole legal guardian of his teenaged daughter, which weighs in favor of some lenience. The defendant was arrested on November 10, 2021 for allegedly assaulting his daughter seriously enough to fracture her wrist. However, the defendant also represents that he has voluntarily participated in outpatient mental health treatment in an effort to work on his anger management issues and improve his relationship with his daughter. The government also understands that the defendant's daughter is temporarily residing with another family member at this time. Taken together, with the defendant's medical issues, the defendant's family circumstances weigh slightly in favor of lenience.

D. <u>Respect for the Law, the Need for Deterrence, and Protection of the Public</u>

With respect to the other Section 3553 factors, a below-Guidelines incarceratory sentence, two years of supervised release, a $90,000 forfeiture judgment, and Court-ordered restitution will promote respect for the law and provide adequate deterrence to the defendant and others contemplating similar acts. See 18 U.S.C. § 3553(a)(2). The defendant's fraud offense was serious and deserves serious punishment. Here, a prison sentence and forfeiture would promote respect for the law by making clear that fraud will result in jail time and disgorgement of ill-gotten gains.

A prison sentence is also needed to specifically deter the defendant and others generally from committing future crimes. The defendant's previous felony conviction also involved a serious fraud crime. There, the defendant forged multiple checks and stole about $82,000 from a bank. Despite the seriousness of that crime, the defendant was sentenced to

---

[4] The defendant also stipulated in the plea agreement to the same Guidelines calculation reflected in the PSR that included the enhancement for an offense involving 10 or more victims.

probation. That sentence did not effectively deter him from committing the instant offense. As such, a sentence of incarceration here is necessary to ensure that the defendant obeys the law going forward. A prison sentence would also deter other individuals contemplating similar crimes that take advantage of consumers.

V. Conclusion

A just sentence in this case must provide appropriate punishment for the defendant's dishonest profiteering in the middle of a nationwide public health emergency. In this case, a sentence of incarceration below the applicable Guidelines range, two years of supervised release, forfeiture of $90,000, and restitution to be determined by the Court, would be sufficient but no more than necessary to satisfy that goal, as well as the other sentencing goals of Section 3553(a)(2).

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Andrew Wang
Andrew Wang
Assistant U.S. Attorney
718-254-6311

cc:    Clerk of the Court (KAM) (by ECF)
       Joseph Caldarera, Esq. (by e-mail)
       Jameka Bing, United States Probation Officer (by e-mail)